UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 2:17-cr-47-PPS |
| ANTONIO WALTON, et al., | ) | |
| Defendant. | ) | |

## **OPINION**

Prior to the trial in this case, I denied the Government's Motion to Admit evidence relating to an uncharged homicide and granted two defendants' motions to exclude the same evidence. [DE 786.] In that order, I indicated that a full opinion would follow. This is that opinion.

**Factual Background**

This is a case in which twenty-one defendants were originally charged with a variety of mostly drug offenses. Four defendants remained for trial. The indictment charged those four defendants with conspiracy to distribute and possess with intent to distribute cocaine and crack cocaine.[1] Defendant John Tyson additionally was charged

---

[1] At the conclusion of trial, Defendants Antonio Walton and Charles Gould were found guilty of conspiracy to distribute and possess with intent to distribute more than 280 grams of crack cocaine. [DE 816.] Defendant Telisha French was found not guilty. [*Id.*; DE 818.]

with one count of distribution of crack cocaine.[2] [DE 485.] At issue in the motions *in limine* was the admissibility of evidence relating to an uncharged homicide of Lydell McLaurin, an alleged member of the charged conspiracy. While the Government and defendants have their differences as to the significance of certain events or facts, the below represents what I think is a fair summary of the events leading up to the McLaurin's death, including how each side views the evidence.

In October and November 2016, after several months of surveillance, controlled buys, and other investigation, police began arresting individuals they suspected were involved in an ongoing conspiracy to sell narcotics. On October 17, 2016, several individuals alleged to be members of the conspiracy, including Lydell McLaurin, were arrested at one of the houses used by the conspiracy to sell crack cocaine. At this point, it is fair to say that at least the object of the conspiracy—to distribute crack and powder cocaine—came to a halt. On November 3, 2016, McLaurin was released on bond, and that bond was posted by Leroy Elmore, another member of the conspiracy.

On the same day that McLaurin was released on bond (November 3, 2016), defendant Antonio Walton, who is alleged to be the ringleader of the conspiracy, was also arrested. But he was not arrested in connection with the indictment in this case. Instead, he was arrested on an outstanding warrant for a prior drug conviction in Indiana state court. In 2012, Mr. Walton had been convicted of drug charges but then

---

[2] On the second day of trial, Defendant John Tyson was severed from the trial due to his ongoing health issues. [DE 793, 794.] He remains to be tried.

failed to appear for sentencing. He was not arrested at any of the residences strictly associated with the drug conspiracy in this case (all of which are clustered together on the same street in Gary, Indiana). Instead, he was arrested at a different residence, located at 3528 Pierce Street, also in Gary, Indiana.

The following day, November 4, 2016, Lydell McLaurin was scheduled to appear in court related to his own arrest. Apparently, he was late to his court hearing, but he did eventually attend. Later that same day, Antonio Walton placed a phone call from jail to his sister (and co-defendant) Telisha French, who at that time had not been arrested. This phone call is the key piece of evidence for purposes of this opinion. The call lasted a little more than five minutes. After discussing a few things, primarily the circumstances of Mr. Walton's arrest, the conversation turned to how the police knew where Mr. Walton was at the time of his arrest. Below is a transcript of that portion of the call:

> **Telisha French:** Uh-huh. Somebody yeah, who said you was over there? Who said that?
> **Antonio Walton:** Exactly. Probably one of them bustas that used to stay down there.
> **TF:** Uh-huh. Yeah, yeah I've gotta clean my kitchen up today it's so dirty. I've been stressed all night.
> **AW:** I already know.
> **TF:** I left my house filthy.
> **AW:** Yeah.
> **TF:** Yeah.
> **AW:** That's crazy.
> **TF:** Yeah uh, my son that stays with me um went to court this morning with some people and um yeah, somebody wasn't there though. Somebody wasn't there in court today.
> **AW:** Yeah.
> **TF:** Yeah this kitchen is filthy I've gotta get this kitchen clean. I'm

disgusted. You know.
**AW:** Uh-huh.

Reading this transcript in isolation, it wouldn't strike anyone as the foundational piece of evidence relating to a conspiracy to commit murder. But as the Government notes, and no defendant really contests, Lydell McLaurin had a nickname, and that nickname was "Kitchen." Accordingly, the Government contends that the references to Ms. French's "kitchen" and that it was "filthy" are her speaking in code that McLaurin had snitched to police and turned over Walton's location to the authorities. Of course, the defendants contest the interpretation the Government offers, but that is the argument connecting the dots by the Government.

At 5:04 p.m. that same day, a telephone call was placed between Telisha French's telephone to Charles Gould's (another co-defendant) telephone. Non-defendant Melena Cottrell testified that she was in a house with Charles Gould at the time of the telephone. And while she does not know Telisha French extensively or have a friendship or really any relationship with her, Ms. Cottrell says that she recognized Telisha French's voice even though Mr. Gould was not talking on speaker phone. Ms. Cottrell says that she heard Telisha French tell Gould that "there is a greenlight on kitchen" and "get with Leroy." Cottrell has further said that Mr. Gould left the house thereafter and had a gun on him when he did.

Later in the night on November 4, 2016 and into the early morning hours of November 5, the Government says that Mr. McLaurin was seen walking into the home of another co-conspirator at 3921 Jackson in Gary, Indiana. Other individuals alleged to

be members of the conspiracy were present at the home, but not Charles Gould, Telisha French, or Antonio Walton (who remained incarcerated as of November 4, 2016). The only evidence of what took place around the murder itself was from a statement to the police given by defendant John Tyson. Tyson told the police that he, McLaurin and co-defendants Dujuana Debose and Yahtzee Harris were there. Tyson said that eventually Harris ordered McLaurin outside the house to an alley. While there are no witnesses who either saw or heard what happened to Mr. McLaurin, the following day, McLaurin's body was found in an alley nearby, shot multiple times. Thirteen discharged cartridge casings were likewise recovered near the body. No murder weapon was ever recovered. The Government has made no allegation in the indictment nor offered any evidence as to who shot McLaurin, who if anyone may have ordered his shooting, when he was shot, or the reason he was shot. The murder remains unsolved and, consequently, no one has been charged with it.

Critically, the indictment in this case does not allege a conspiracy to commit a drug related murder or anything of the sort. It alleges a conspiracy to distribute and possess with intent to distribute cocaine and crack cocaine, as well as individual distribution and firearms charges (unrelated to the murder) against various defendants. The homicide of Lydell McLaurin is not referenced whatsoever in the indictment. But the Government contends it was an overt act committed in furtherance of the drug conspiracy notwithstanding the fact that an overt act is not an element of a drug conspiracy. At bottom, what the Government is really contending is that the murder

evidence is relevant to proving the existence of the charged conspiracy.

## Discussion

The defendants raise a multitude of arguments as to why this evidence should be excluded. I need not address all of them, such as the constructive amendment of the indictment argument which lacks merit, because I find there are other evidentiary bases by which this evidence should be excluded from trial. I will focus on the danger of unfair prejudice and the fact that the homicide is temporally and substantively distinct from the drug conspiracy charged in this case. As such, it is not admissible.

To begin with, I'll note that Rule 404(b) is not implicated in the present motions. That rule bars "[e]vidence of a crime, wrong or other act" if it is being offered "to prove a person's character in order in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But such evidence may be admissible for another purpose. *See* Fed. R. Evid. 404(b)(2). Rule 404(b) is not implicated when the conduct or acts in question goes to the specific crime charged in the indictment. Thus, in a conspiracy case, "[w]hen evidence is embraced by the conspiracy in the indictment, the court need not resort to Rule 404(b) analysis. Rule 404(b) is inapplicable where the bad acts alleged are really direct evidence of an essential part of the crime charged." *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009) (citation and internal quotation marks omitted). The Government has specifically eschewed any reliance on Rule 404(b). As a result, I need not discuss this theory of admissibility.

Federal Rule of Evidence 403 states that otherwise relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As discussed in this opinion, nearly all of those dangers would be present in this case if the evidence of the murder of Mr. McLaurin was admitted.

The initial issue is whether the evidence of the murder is probative of the charged offense—conspiracy to distribute drugs. The Government seems to think that because this is a conspiracy prosecution, that leads to the conclusion that anything done by a conspirator is admissible. But the Supreme Court held long ago that conspirator acts which went to an "uncharged conspiracy aimed at preventing detection and punishment" were not admissible as to the original criminal conspiracy. *Krulewitch v. United States*, 336 U.S. 440, 444 (1949). That describes this case to a tee. Under *Krulewitch*, the "uncharged conspiracy" in this case—the conspiracy to murder McLaurin—is inadmissible as to the "original" drug conspiracy. Considering the same issue roughly a decade later the Court reaffirmed this principle, holding that "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime." *Grunewald v. United States*, 353 U.S. 391, 405 (1957). Even accepting the Government's view of the evidence, the McLaurin murder would be an act of concealment done only after the

central objectives of the drug conspiracy had already been attained.

To determine whether acts are in furtherance of the main criminal objective or mere acts of concealment, cases in the Seventh Circuit look to whether the acts are "inextricably intertwined" with the objective or occurring simultaneously. *See United States v. Hicks*, 368 F.3d 801, 807 (7th Cir. 2004). Other cases look to whether the objectives of the conspiracy have been achieved at the time of the acts in question. *See United States v. McKinney,* 954 F.2d 471, 475 (7th Cir. 1992) ("Generally, a conspiracy to commit murder ends when the murder has been committed.") (holding that evidence of post-murder conspiratorial discussions should be excluded). This helps distinguish a conspiracy from a racketeering enterprise in which a cohort may engage in a variety of predicate acts or crimes. *Id.* In narcotics cases, some courts have ruled that once the conspirators have all been arrested and the operation shut down, the conspiracy's main objective has necessarily ended, rejecting arguments that such conspiracies are necessarily open-ended. *See, e.g.*, *United States v. Fadeyi*, No. 00 CR 153, 2000 WL 33155618, at *3 (N.D. Ill. Dec. 21, 2000).

In support of allowing the homicide into evidence, the Government relies primarily on *United States v. Hicks*. In *Hicks*, the murder in questionand other violent acts occurred while the drug conspiracy was ongoing and went to show *how* the conspiracy itself operated. *Hicks*, 368, F.3d at 807-808. The McLaurin homicide doesn't have the same value in this case. For starters, unlike in *Hicks*, the homicide occurred after the drug conspiracy had been effectively halted with raids on the homes involved

and the arrests of the key players. What's more, there is no other act of violence whatsoever associated with the alleged drug conspiracy in this case. When pressed on this point at the hearing, the Government conceded as much. They advised that the only other known act of violence of the conspirators involved an incident in which conspirator Courtney Crouch allegedly shot up a rival's car. But rather than embrace this violence, Crouch was allegedly suspended or iced out from the conspiracy for a period. Thus, the only evidence of violence involving the co-conspirators cuts against any argument, as in *Hicks*, that the violence or homicide went to show *how* the conspiracy conducted its affairs. Thus, *Hicks* is distinguishable on a number of fronts.

More to the point, as noted above, the McLaurin homicide seems to fall squarely into the category of evidence the Supreme Court held should be excluded in *Krulewitch* and *Grunewald*. Viewing the evidence in the light most favorable to the Government, the McLaurin homicide was orchestrated by the defendants to either cover up their tracks or to punish McLaurin for providing information that led to Walton's arrest. It is difficult to ascertain the true motive. But based on what we do know, the contents of the telephone call between Antonio Walton and Telisha French, their focus seems to be not so much even on covering their tracks, but instead on figuring out who gave up the location of the house in which Walton was arrested and exacting revenge on them. Apparently, law enforcement learned of his whereabouts by pinging Walton's cellphone, unbeknownst to him. But at the time, it seems that both French and Walton suspected that McLaurin was cooperating with police and gave Walton up.

In view of the Supreme Court cases discussed above, one could readily conclude that the evidence of the McLaurin murder has no probative value at all *to the charged conspiracy*. But even if there were some probative value to the evidence to establish that the conspiracy existed, that probative value must be weighed against the other factors set out in Rule 403. If the potential prejudice from the McLaurin homicide substantially outweighs its probative value, it is properly excluded. One need not speculate too much about what prejudice could ensue if this information was presented to a jury. Involvement in a homicide is a whole different kettle of fish compared to a conspiracy to distribute cocaine and crack cocaine. In addition, there are concerns over the time that would be wasted to present this convoluted evidence. Lastly, there are serious concerns regarding the potential for jury confusion. Almost any rational juror would have questions as to why the Government was suggesting that the defendants orchestrated the premeditated murder of a co-conspirator but the only charge in the case is for conspiracy to distribute drugs. Even with limiting instructions, it would be difficult to have a jury consider this evidence "only" as to the existence of the conspiracy or how it operated as a general matter.

This likelihood of confusion, needless consumption of time, and unfair prejudice must then be weighed against the probative value of the evidence. Recall that this evidence is only being offered as an act in furtherance of the *drug conspiracy* charged in the indictment. Ostensibly, it is being offered to help show that a conspiracy existed. But critically, the murder occurred *after* the key coconspirators had been arrested and

their operation was shut down. Therefore, it had little probative value to the key issues in this case: Did a conspiracy to distribute drugs exist, and if so, were the defendants on trial members of that drug conspiracy?

Finally, this isn't a situation where, without the evidence of the McLaurin murder, the Government is left with a conceptual hole in the presentation of its case. The jury will not be left to wonder what took place during the so-called gap in the evidence. There is no gap. For all intents and purposes the murder of McLaurin was committed after the central objective of the conspiracy had concluded and after the conspiracy had been taken down by law enforcement. It's at most an epilogue to the Government's narrative, not a missing chapter.

In sum, the evidence of the McLaurin murder has only little, if any, probative value. Whatever probative value it does have is substantially outweighed by the undue prejudice to the defendants, the waste of time and the confusion of issues for the jury. The evidence must therefore be excluded.

**Conclusion**

As previously ordered, and for the foregoing reasons discussed herein, the evidence relating to the uncharged homicide of Lydell McLaurin is excluded from trial.

SO ORDERED on April 1, 2020.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT